**UNITED STATES of America,**

v.

**Anthony Dewayne ALLEN.**

**No. 1:01–CR–80.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

June 10, 2002.

---

### MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, Chief Judge.

Before the court is Defendant, Anthony Allen's ("Allen's") "Motion in Limine" filed

on March 28, 2002 seeking to exclude certain expert opinions relating to footwear impression evidence anticipated to be elicited at trial by a government witness based upon the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court held an evidentiary hearing on April 24, 2002 and took the matter under advisement pending the submission of briefing on the issues. Briefing concluded on June 3, 2002. After a thorough review of the evidentiary record and the briefs, the court herein confirms the general admissibility of footwear impression evidence under *Daubert* and, to that extent, Defendant's Motion in Limine is DENIED. The court shall reserve ruling on the specific witness testimony after a supplemental *Daubert* hearing to be held on June 13, 2002 at 3:00 p.m.

### BACKGROUND

Allen is charged in a single count indictment with a violation of 18 U.S.C. § 2113(a). The indictment alleges that on or about October 28, 2001, the defendant entered or attempted to enter the Standard Federal Bank located at 4036 Coldwater Road, Fort Wayne, Indiana, whose deposits were insured by the Federal Deposit Insurance Corporation, with intent to commit a felony therein, namely taking and carrying away with intent to steal property and money belonging to and in the care, custody and control of the bank. In its case in chief, the Government intends to call Fort Wayne Police Forensic Examiner, Thomas Pitzen ("Pitzen"), to offer testimony regarding the comparison of a shoe print left inside the burglarized bank with the footwear recovered from the defendant at the time of his arrest. Specifically, Pitzen is anticipated to testify that a gelatin impression of an unknown shoe print left at the scene of the bank burglary corresponds in size and physical characteristics with the shoe the defendant was wearing at the time of his arrest. The Government concedes that Pitzen will not and cannot positively identify the shoe the defendant was wearing as the shoe print left at the scene of the bank burglary, only that the Defendant's shoe "could be" the shoe that was in the bank. Allen's motion in limine is directed at this testimony and he argues that the shoe print evidence is not reliable scientific evidence and will not be helpful to the jury in deciding an issue of fact. It is to this issue the court turns presently.

### DISCUSSION

■ "Federal district courts have the power to exclude evidence *in limine* pursuant to their authority to manage trials." *Charles v. Cotter*, 867 F.Supp. 648, 655 (N.D.Ill.1994) (*citing Luce v. United States*, 469 U.S. 38, 41 n. 4, 105 S.Ct. 460, 463, n. 4, 83 L.Ed.2d 443 (1984)). In *Hawthorne Partners v. AT & T Technologies*, 831 F.Supp. 1398 (N.D.Ill.1993), the court set forth the considerations governing a motion in limine as follows:

> This court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds. Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context. Denial of a motion *in limine* does not necessarily mean that all evidence contemplated by the motion will be admitted at trial. Denial merely means that without the context of the trial, the court is unable to determine whether the evidence in question should be excluded. The court will entertain objections on individual proffers as they arise at trial, even though the proffer

falls within the scope of a denied motion *in limine.*

*Id.* at 1400–01. Thus, as the term "in limine" suggests, a court's decision on such evidence is preliminary in nature and subject to change. *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir.1989). With these principles in mind, the Court now turns to the background for the testimony the Government seeks to offer at trial.

### Hearing Testimony

At the evidentiary hearing, the Government offered the testimony of two witnesses to establish the scientific reliability of shoe print impression evidence in general. The first witness, Sandra Wiersema ("Wiersema"),[1] is a forensic examiner with the Federal Bureau of Investigation Laboratory in Washington D.C. whose exclusive duties at the FBI laboratory relate to footwear and tire tread evidence. The Government also proffered testimony from a second witness, John R. Vanderkolk ("Vanderkolk"), manager of the Indiana State Police Laboratory, Fort Wayne, Indiana and a criminalist. Vanderkolk oversees laboratory operations and supervises crime scene technicians. He also maintains proficiency in footwear, tire track, physical comparisons of broken and torn items, fingerprint examinations and firearm toolmark examinations.[2] Vanderkolk authored the Indiana State Police training manual for latent fingerprints, footwear, and tire tracks examinations. He also teaches crime scene technicians on the documentation of crime scenes and was the primary instructor of proposed expert witness Pitzen in the areas of footwear, tire tracks and physical comparison of torn items.

### Methodology for Footwear Impression Evidence

#### A. Wiersema's Testimony

Wiersema set forth the process she undertakes in obtaining footwear impression evidence in this way. First, she examines the shoe impression taken from the crime scene ("the Unknown Impression") and makes an initial determination as to whether the Unknown Impression contains sufficient detail to yield reliable results. Second, Wiersema photographs the Unknown Impression, records its condition,

---

1. Wiersema has a professional certification as a Footwear Examiner by the International Association for Identification Footwear Certification Board, Bachelor of Science degree in Chemistry from St. Louis University, and she has completed the course work for a Master's Degree from California State University. She has a plethora of professional affiliations relating to her field of study including the following: Member and past president of the California Association of Criminalists, Member of the Criminalistics Section of the American Academy of Forensic Sciences, Member of the International Association for Identification, Member of the Mid–Atlantic Association of Forensic Scientists, Chairperson of the International Association for Identification Footwear Certification Board. Wiersema has received consistent training from numerous organizations since 1976 including the CA Criminalistics Institute and the FBI Forensic Science Research and Training Center. Wiersema has authored four publications includ-

ing publications in the Journal of Forensic Science and several articles in the Clinical Toxicology Journal. Wiersema is also lectured with some frequency on the topics of footwear impression evidence as well as other impression evidence.

2. Like Wiersema, Vanderkolk has a number of professional affiliations and accreditations including affiliations with the International Association for Identification, Editorial Board Member of the Journal of Forensic Identification, Illinois and Indiana Divisions of the International Association for Identification, the Canadian Identification Society, and the Scientific Working Group for Friction Ridge Analysis. Vanderkolk has authored several publications for the Journal of Forensic Identification and made numerous presentations to numerous state divisions of the International Association for Identification relating to impression forensic issues.

and enhances the impression to correspond with the natural size as it would appear at the crime scene. Next, Wiersema photographs the shoe submitted for comparison ("the Known Shoe") to record the condition in which she received the shoe. Wiersema then proceeds to make a test impression of the outer sole of the Known Shoe by dusting the bottom of the shoe with fingerprint powder, placing the shoe on her foot, and stepping onto a clear adhesive material. By this process, the fingerprint powder from the underside of the Known Shoe adheres to the adhesive material to provide an impression of the Known Shoe.

Next, Wiersema begins the critical analysis phase in which she examines the manufactured features of the two impressions to observe whether the designs align in the same locations, have a similar size, and whether they meet the edge of the outsole in the proper location. Wiersema further examines the impressions for wear, noting whether the wear is in the same location on both impressions. She also identifies any unique identifying characteristics such as cuts, tears or rocks in the outersole. Using this analysis, Wiersema testified that a positive identification, that is, that the Known Shoe and only the Known Shoe could make the Unknown Shoe impression is possible but that such identifications occur in only 15 to 20 percent of the cases. (Tr. p. 34).[3]

Wiersema described two methods of comparisons typically used in the critical analysis process. Wiersema typically utilizes a "superimposition comparison" in which she takes the Known Shoe impression and superimposes it over the Unknown Shoe impression to conduct the critical analysis process. There is also a second comparison method termed "side by side comparison" wherein the examiner is "looking at the shoe, looking at the test impression and looking at the questioned impression to verify that those, are, in fact, characteristics that are on the bottom of the shoe." (Tr. p. 30). According to Wiersema, when she performs a superimposition comparison, she is also performing a side by side comparison because for each defect she might find through the superimposition comparison, she "would go back to the bottom of the shoe to verify that, in fact, there is a defect, there is a scratch, there's a rock, there's something on the bottom of the shoe that caused that defect." (Tr. p. 30).

Wiersema also described the process of making a test impression of an unknown shoe through the use of gelatin lifts. According to Wiersema, this process is typically used for dust impression or wet origin impressions.[4] She explained that she uses a commercially prepared gelatin lift which is comprised of a thin gelatin material that is poured over the top of a canvas or fabric backing. A clear cover protects the gelatin lift from contamination. To use the gelatin lift, the clear cover is removed, the lift is laid over the top of the unknown impression, the fabric backing is then rolled slightly to ensure that the gelatin lift comes in contact with the unknown

---

3. Wiersema also testified about her knowledge and familiarity with a publication entitled "Footwear Impression Evidence" authored by William J. Bodziak ("Bodziak"). In his filings, Defendant cites to Bodziak and states that "neither size nor an 'exact match' is possible under the methodology available today regarding shoe prints." (Second Motion in Limine, p. 5). Wiersema testified that she has spoken to Bodziak and he "has no

statement such as that in his book." (Tr. p. 40). Wiersema then explained that Bodziak "... does not like the terminology 'match' as relating to footwear. He uses the term 'corresponds in size and design.' He does not use the term 'match.' " (Tr. p. 42).

4. Wiersema described a "wet origin impression" as one that occurs after a damp shoe walks across a floor and the footprint dries.

impression. After waiting a minute or so for the gelatin to adhere to the impression, the lift is removed and submitted for examination photography. Wiersema "always recommend[s that] you photograph a gelatin lift." (Tr. p. 38). Although the record is unclear on this point, it appears that despite the different method of obtaining the test impression, i.e., gelatin vs. powder, the critical analysis phase of the examination remains the same.

During cross-examination, defense counsel specifically questioned whether the technique used to obtain gelatin lift test impressions distorts the unknown impression, to which Wiersema responded as follows:

A: Is there distortion in a lift? No. I mean, I suppose it's possible if you put it on a really unusual surface then, you I don't know if you saw a shoe print that sort of rolled off the edge, and you tried to roll it along the edge and push it. But I would say in general when I have looked at gelatin lifters, I have not noticed distortion.

Q: Does that depend, though on the application of the gel; if there are air bubbles in it if you push it too hard?

A: Well, see, we would not consider air bubbles to be distortion. It might interfere with your ability to see the impression very well, but I wouldn't consider that to be distortion. To me, distortion is someone sliding across a floor and coming to a stop or jumping and doing a little bit of a skid. That to me is a distorted impression because I'm not seeing a really nice, clear, clean outline of the shoe. I'm seeing what I call a

distorted or a disformed, a malformed impression.

(Tr. pp. 38–39).

## B. Vanderkolk's Testimony

Vanderkolk described a methodology similar to the one described by Wiersema for creating footwear impression evidence.[5] Vanderkolk explained that he teaches footwear examination by a widely accepted method called ACE–V, an acronym for Analysis, Comparison, Evaluation, and Verification. He described the Analysis as a three step process which involves the examiner looking at the detail in the unknown impression, studying and evaluating that detail, and then examining the known image. During the Comparison phase, the examiner engages in a critical comparison of the unknown image to the known image by one of several methods, either a side-by-side comparison or by the overlay method. This leads to the Evaluation stage where the examiner applies his or her training and expertise to evaluate the comparison and draw conclusions. Finally, Verification occurs through an outside or independent examiner who re-examines the conclusions drawn through the ACE process.

### Rates of Error and Proficiency Training

Wiersema explained that examiners in most laboratories undergo proficiency training and testing to ensure accuracy in their field. (Tr. p. 22). In her laboratory, for instance, proficiency examinations occur twice a year and examiners are provided a test sample that requires the examiner to make an initial examination, make test impressions, and critically analyze the results. These tests are then passed onto the control quality assurance unit who review the results of the tests. Wiersema was not asked and did not offer any testi-

---

5. The record is unclear as to whether Wiersema and Vanderkolk describe the same pro-cess, although the two processes do appear to be similar in many respects.

mony or statistics as to the results of those proficiency tests.

With respect to the rate of error in the ACE–V process, Vanderkolk testified that the error rate of the process itself is zero, meaning that based upon the science, the shoe either did or did not make the impression. Any error that does occur, according to Vanderkolk, is caused by examiner error in the application of the process or by examiner error in reaching a particular conclusion. However, Vanderkolk testified that, in his experience, examiner error is very rare.

### Peer Review and General Acceptance within the Forensic Community

Vanderkolk testified that the ACE–V method he described is subject to peer review in forensic journals and seminars and that this footwear examination science is generally accepted throughout the world. Likewise, Wiersema testified that the methods for examining footwear impressions that she described are widely accepted in the forensic community and have been utilized since the 1700s. The two witnesses proffered a lengthy list of journals and publications [6] in which there is discussion of this general methodology of examining footwear and other impression evidence.

### DISCUSSION

In his Motion in Limine, the Defendant asserts that the opinions of the proposed expert are not reliable in that the underlying methodology which forms the basis of the proposed expert's conclusions is not scientific in nature. Defendant argues, for instance, that the methodology of footwear impression evidence is not supported by provable principles of general acceptance; is not subject to testing and/or peer review and publication; the conclusions are subject to a high rate of error even with use of the standard methodology; the gel print technique used in this case is subject to distortion; and conclusive results are not possible. In response, the Government contends that Pitzen's proposed testimony is reliable and will aid the jury in its determination of the facts of the case. After a review of the legal standards to be applied to the admissibility of expert testimony, the Court shall consider these arguments.

The admissibility of expert testimony— whether based on "scientific," "technical," or "other specialized" knowledge—is governed by Fed.R.Evid. 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

---

6. Wiersema offered a list of four books exclusively relating to footwear impression evidence, including: *Footwear Evidence* by John Abbott; *Footwear Identification* by Michael Cassidy; and the first and second editions of *Footwear Impression Evidence* by William Bodziak. In addition, the bibliography submitted lists six other books including: *Handbook of Forensic Science* and the *Crime Scene Search and Physical Evidence Handbook* published by the U.S. Government Printing Office; *Crime Investigation,* authored by Paul Kirk; *Tire Imprint Evidence,* by Peter McDonald; *Forensic Science Handbook,* by Richard Saferstein. The bibliography further contains references to 206 articles in various journals including the Journal of Forensic Science; Journal of Criminology, Criminal Law, and Police Science; Journal of Forensic Identification; FBI Law Enforcement Bulletin and; Identification News.

Stated simply, a threshold matter under Fed.R.Evid. 702 requires a district court to determine "(1) whether the expert would testify to valid scientific knowledge, and (2) whether that testimony would assist the trier of fact with a fact at issue." *Smith v. Ford Motor Company*, 215 F.3d 713, 717 (7th Cir. June 2, 2000) (quoting *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 590 (7th Cir.2000)). The Supreme Court in *Daubert* and more recently in *Kumho Tire Co. Ltd., v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) provided further guidance on the court's task under Fed.R.Evid. 702, by emphasizing the district court's "gatekeeping" function to ensure that expert testimony, be it traditional scientific evidence or founded on engineering principles or other technical or specialized knowledge, is both reliable and relevant. *Kumho*, 526 U.S. at 141, 119 S.Ct. at 1171 and 1176. Thus, the first prong of Rule 702 tests the reliability of the testimony; the second prong tests its relevance. *Frey v. Chicago Conservation Ctr.*, 119 F.Supp.2d 794, 797 (N.D.Ill.2000).

The fundamental purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S.Ct. at 1176. Indeed, the gatekeeping role is designed "to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves." *DePaepe v. General Motors*, 141 F.3d 715, 720 (7th Cir.1998).

The basic task of the district court with regard to analyzing reliability is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert used in reaching his conclusions. *Kumho Tire*, 526 U.S. at 153, 119 S.Ct. at 1176–1177. In examining whether the expert is qualified in the relevant field, the court should consider a proposed expert's "full range of practical experience as well as academic or technical training." *Smith*, 215 F.3d 713, 718. Further, when examining the expert's methodology, the court must look only at the methodology employed by the expert. *Id.* In other words, "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.' " *Kumho*, 526 U.S. at 149, 119 S.Ct. at 1175 (brackets in original) (quoting *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2786). The court must leave it to the trier of fact to evaluate the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis." *Id.*

*Kumho* further indicates that in assessing reliability the district courts are entitled to be "flexible" and are not required to consider the familiar *Daubert* "factors" (i.e., whether a theory or technique can be or has been tested, whether it has been subjected to peer review and publication, whether it has a known or potential error rate, and whether it enjoys a general acceptance within a relevant scientific community) in every case involving expert testimony. Rather, the Supreme Court held that the decision to apply some or all of the *Daubert* factors in a particular case lies within the district court's discretion. *Kumho*, 526 U.S. at 150, 119 S.Ct. at 1175 ("the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.") (citation omitted); *Id.* 119 S.Ct. at 1176 ("whether *Daubert's* specific factors are, or are not,

reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.").

■ As a preliminary matter, the court has very little evidence before it as to the reliability, qualifications, or expertise of the proposed expert witness in this case. The court has no doubt (and defense counsel did not pursue any argument to the contrary) that the two witnesses who provided testimony at the *Daubert* hearing are qualified in the relevant field. Their credentials, as outlined by the Government at the hearing, in both education and practice are extensive. But this is not the inquiry which *Daubert* and its progeny require this court to make. Rather, as noted above, the court must determine whether the proposed expert who will offer testimony at trial is qualified. *Kumho Tire,* 526 U.S. at 153, 119 S.Ct. at 1176–1177. Here, the Government did not call Pitzen, the proposed trial witness, as a witness during the *Daubert* proceedings. It did submit, in its request for a hearing, Pitzen's curriculum vitae which describes Pitzen's qualifications and training in the area of forensic science. Pitzen has five years experience as a forensic examiner and has undergone substantial training in the areas of fingerprint, palm print, footwear, tire track and other physical comparisons. He is a certified law enforcement instructor and has instructed numerous groups in latent fingerprint processing (a process similar to the science of footwear impressions) and in evidence collection and packaging. What this documentation does not tell the court, however, is Pitzen's proficiency in obtaining impression evidence, how frequently he utilizes his training in the area of impression evidence, how often he is proficiency tested, etc. Without such evidence before it, the court cannot conclude with any certainty that Pitzen is qualified to offer an opinion on footwear impression evidence.

Next, the court must examine the reliability of the methodology the expert used in reaching his conclusions. *Kumho Tire,* 526 U.S. at 153, 119 S.Ct. at 1176–1177. Here again, the court is faced with a unique situation in that the Court has not been informed as to what methodology Pitzen used in reaching the conclusions he proposes to offer at trial. As noted previously, Pitzen did not testify and the Government represented at the hearing that Pitzen, had not, at the time of the hearing, followed the comparison techniques described by Wiersema and Vanderkolk. At the outset of the hearing, the Government engaged in the following colloquy with the Court:

> **Government Counsel:** ... The second issue that I will tell the Court is that the comparison methodology used by the Fort Wayne Police Department in this particular case is not the technique, method of comparison that was taught, but the methodology was used.
>
> Now here's the point. That's why I say I've got two things. Is the methodology valid and reliable? And then, what happened in relationship to this particular case, the methodology is the same, the technique of comparison was not what he was taught by the Indiana State Police.
>
> The final thing that I would say is, having said that, that based on that, and based upon the preparation for this trial, and my knowledge and the level of understanding in regard to this technical knowledge has certainly arisen. By the time of trial, it will comport with those standards.
>
> **Court:** I'm sorry, I don't follow that point.
>
> **Government Counsel:** What I propose to do is, and in a nutshell, here's the

issue. There's two way of comparing shoes primarily. It's called side by side, and the second method is called superimposition, where you impose one on top of the other.

In this particular case, the forensic examiner did a side by side comparison. The preferred method of doing a side by side comparison is to take the known shoe, in this case the shoe of the defendant, and make an impression in some medium. You have an impression or a lift that you took from the crime scene and you compare those two impressions.

In this particular case, what the examiner did was he took the bottom of the shoe, made a picture of the bottom of the shoe, compared the picture of the bottom of the shoe to the lift that was taken out of the bank. He did not make—put this other step in there in terms of making an impression so you've got impression to impression, but we have picture to picture. But by the time of trial, he will make that—put that other step in.

(Tr. pp. 14–15). From this colloquy, it appears that what the Government seeks presently is a determination by this Court that the general methodology of footwear impressions, as described by its two witnesses, is valid and reliable without any pre-trial demonstration that this methodology was employed by the proposed expert in the present case. Assuming the Court concludes that the general methodology is reliable, the Government then plans to show at trial that its expert employed the methodology and the techniques preferred by the methodology. Thus, the only evidence presently before the Court in response to the Defendant's motion is the general methodology regarding footwear impressions.

As to this evidence, the Defendant's main challenge is that it is not "scientific evidence" as contemplated by *Daubert*.

The Defendant claims, for instance, that there are no uniform standards for the industry and that the methodologies described by the experts differ but, in any event, the "science" consists of no more than looking at two objects with the naked eye and concluding whether they are similar or different. For this reason, the Defendant argues, the jury could draw its own conclusions from the evidence without the aid of an "expert."

Having reviewed the record presented at the hearing, the court concludes that the methodology described by Wiersema and Vanderkolk is reliable in that the conclusions reached by those in the field are the product of reliable technical or specialized principles and methods. As the Government points out, Rule 702 is not limited to merely scientific evidence but permits expert testimony if the testimony relates to "technical or other specialized knowledge" that would assist the trier of fact to understand the evidence or determine a fact in issue. FED.R.EVID. 702; see also, *Kumho Tire Co.*, 526 U.S. at 141 (extending Daubert's main holding to technical and other non-scientific experts). Here, both Wiersema and Vanderkolk testified as to the specialized nature of obtaining footwear impression evidence. Both described a similar process whereby test impressions are made and critically compared to one another by qualified, trained, and experienced examiners. Both explained that the critical comparison phase of the analysis, while it may appear to Defendant to be a simple matching process not requiring any specialized skill, requires a critically trained eye to ensure accurate results. *See* Tr. p. 26 ("I think the average lay person would notice large differences, differences in design, I think ... The average lay person I probably would—well, I think would not notice the difference between a size nine and a half and a size ten shoe. And I certainly do not think the

average lay person would notice the subtle differences that occur between three molds of a size ten ...."); see also Tr. p. 57. At the hearing, Vanderkolk demonstrated this principle by the use of two photographs of shoe outer soles and asked the court to compare the two. To the untrained eye, the shoes appeared very similar, if not identical. However, after Vanderkolk pointed out the subtle differences between the two shoes in the photographs, it was abundantly clear that the shoes were dissimilar. Vanderkolk explained how, through his training, he is able to determine the dissimilarities between the shoes in this way:

Q: ... Can you tell us briefly how you would go about pointing out differences or what differences there are, if any?

A: My understanding of the manufacturing process and the molds involved, you understand that there are subtle differences in the molds that might produce the same size, same general sole of a shoe. My understanding of the subtle differences, I would first look at where I might see subtle differences occurring. That is usually the edge of the shoe sole. So if I look at the edge of the sole, the heal and the ball area and the toe area and the outer side area, I can see how the elements are different sizes and different arrangements specifically around the edges of the sole.

(Tr. p. 58). With this demonstration, it appears clear to the court that the subject of footwear impression evidence is a body of technical or specialized knowledge within the meaning of Rule 702 in that it requires special skill and knowledge to reach competent results.

This said, "[t]he admission of expert testimony from technical fields is governed by the same concerns and criteria as the admission of scientific expert testimony", but with respect to technical testimony, the "Supreme Court in Kumho Tire explained that the Daubert 'gatekeeper' factors had to be adjusted to fit the facts of the particular case at issue, with the goal of testing the reliability of the expert opinion." *United States v. Brumley*, 217 F.3d 905, 911 (7th Cir.2000) (citing *Kumho Tire Co.*, 119 S.Ct. at 1175). Here, contrary to the Defendant's representations, the Government witnesses established that examiners of footwear and other impression evidence are routinely tested to ensure proficiency in the field; that the techniques described have been generally accepted in the forensic community; and that the methodologies described are subject to peer review. As a result, the court concludes that the methodology of footwear impression evidence described by the Government witnesses is reliable and meets the standards for admissibility of expert testimony.

The court is also mindful that the reliability of this process has been upheld in numerous recent cases as applied to fingerprint identifications, see *United States v. Cruz–Rivera*, 2002 WL 662128 (D.P.R., March 27, 2002) (denying motion to exclude fingerprint identification under *Daubert*); *United States v. Plaza*, 179 F.Supp.2d 492 (E.D.Pa.2002), vacated on reconsideration, 188 F.Supp.2d 549 (E.D.Pa. Mar.13, 2002) (FBI fingerprint expert could testify as to his opinions since "ACE–V" fingerprint identification technique or its equivalent was in widespread use and there was evidence that FBI fingerprinting experts very seldom made erroneous determinations); *United States v. Martinez–Cintron*, 136 F.Supp.2d 17 (D.P.R.2001). Thus, this court sees no reason not to extend the reasoning of these opinions to the technique of footwear impression evidence which is substantially the same as that of fingerprint impres-

sions.[7]  Indeed, as one judge recently explained:

> ... in two extremely detailed treatments of the law and data concerning fingerprint identification, here and abroad, Judge Pollak of the Eastern District of Pennsylvania has upheld the admissibility of such expert testimony following the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) ... It is unnecessary to revisit the topic after such a thorough treatment, and the question of admissibility of the general technique should not vary from district to district in any event.  Unless and until Judge Pollak's thorough treatment is reversed on appeal, it is law that should be followed.

*Cruz–Rivera*, 2002 WL 662128 at *1.

Here, Wiersema testified that shoe print evidence is a subset of a body of evidence known generally as impression evidence. Included within the categories of impression evidence are fingerprints, tire tread evidence, lift prints, rubber stamp, typewriter or "any type of an object that can impress itself against another surface, and leave an impression itself against another surface." (Tr. p. 23).  According to Wiersema, "all of this type of evidence normally is examined using powder matching skills, powder matching techniques." *Id.* Given that the processes for obtaining

footwear impression evidence and fingerprint identification evidence are similar, the court has no reason to alter the conclusions of the various courts that have already examined the process under the holdings of *Daubert* and *Kumho Tire* and concluded that the process has the indicia of reliability.  Further, at least one circuit has held footprint impression evidence admissible under *Daubert's* standards. *United States v. Ross*, 263 F.3d 844 (8th Cir.2001) (expert testimony from FBI forensic examiner linking footprints and tire imprints found in snow at scene of bank robbery to defendant's car tires and shoes met *Daubert* admissibility requirements). Accordingly, the court finds that the methodology described by the Government witnesses is reliable.

■  The court also concludes that the proposed expert's testimony, assuming use of the standard methodology described, is relevant in this case.  The Seventh Circuit has explained that:

> ... the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or determining a fact in issue.  This second step requires that the district court consider whether the proposed scientific testimony fits the issue to which the expert is testifying.  In other words, a district court may admit expert testimony only if such testimony will assist the trier of fact to understand

---

**7.**  Of course, the characteristics examined during the critical analysis phase differ depending on the type of subject impression.  In analyzing footwear impressions, examiners are taught to examine the two shoes for similarities in pattern, wear, design alignment, and size as well as for unique distinguishing characteristics such as any tears, rocks, or cuts in the outsole of the shoe.  The Government witnesses did not explain how it is that an examiner concludes from this criteria that

a shoe did, could have, or did not make the unknown impression.  For instance, are there a minimum number of similarities that must be present before an examiner may draw a conclusion?  As Judge Pollak noted in his decision, fingerprint analysis involves examination of Galton points and there is a lack of uniformly controlling standards as to how many Galton points must exist before an exact match may be made.  *See Plaza*, 188 F.Supp.2d 549, 554.

the evidence or determine a fact in issue.

*United States v. Hall*, 165 F.3d 1095, 1102 (7th Cir.1999) (internal quotation marks and citations omitted); *Smith*, 215 F.3d at 717 ("the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case."). Here, whether the shoe impression taken from the bank is similar to the shoe the Defendant was wearing at the time of his arrest is certainly relevant to the jury's determination of the disputed issue of whether the Defendant was, in fact, in the bank as alleged by the Government. Further, having an expert explain how he reached his conclusions and subjecting those conclusions to vigorous cross-examination is helpful to the jury in that it aids the jury in determining the reliability of the expert's testimony.

Defendant also argues that because Pitzen cannot conclusively state that the shoe print found inside the bank matches the defendant's shoe, his opinion is unhelpful to the jury and confusing. Yet neither *Daubert* or *Kumho Tire* require an expert to have an opinion on the ultimate question to be resolved by the trier of fact. *Walker*, 208 F.3d at 587 (7th Cir.2000). Defense counsel will certainly have the opportunity to cross-examine Pitzen and inquire into this point. Counsel may also challenge, through cross-examination, the soundness of the factual underpinnings upon which Pitzen bases his conclusions as well as the correctness of the expert's conclusions based on that analysis. It bears reminding that "the trial court's role as gatekeeper [under Daubert] is not intended to serve as a replacement for the adversary system." Fed.R.Evid. 702 advisory committee's note, citing *United States v. 14.38 Acres of Land More or Less Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir.1996). Indeed, *Daubert* instructs that "vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence ..." 509 U.S. at 596, 113 S.Ct. at 2798. Here, through cross-examination, defendant will have ample opportunity to challenge the proposed expert's opinion and to explain to the jury how that opinion is, in his opinion, erroneous.

Finally, as the Government points out, the use of expert testimony in this case also serves as a prophylactic measure for the defendant in that it prevents a jury comprised of untrained eyes from evaluating the forensic evidence in this case and reaching what is, perhaps, an erroneous conclusion clearly not supported by the forensic evidence. As indicated previously, both government witnesses testified that the science of shoe print comparisons require the training and expertise from professionals to ensure an accurate conclusion. Thus, in this case the use of expert testimony to explain the details and underpinnings of the expert's conclusions would be helpful to the jury's assessment of the facts of the case thereby making the footwear impression testimony relevant.

This court holds today that the general and traditional methodology for obtaining footwear impression evidence, as outlined above, meets the *Daubert* admissibility standards for expert testimony relating to technical and other specialized knowledge. Accordingly, to the extent, Defendant's Motion challenges the admissibility of expert testimony rooted in this traditional methodology generally, the Motion in Limine is DENIED.

With this conclusion, however, the court's present inquiry must come to an end. "A district court should not make a *Daubert* determination when the record is not adequate to the task," *Jahn v. Equine*

*Services, PSC.*, 233 F.3d 382 (6th Cir. 2000), and simply put, the court is without an adequate record to ultimately consider the question posed by the Defendants' Motion in Limine, that is, can Pitzen offer an expert opinion in this case that the shoe impression taken from inside the bank "could be" the defendant's shoe? Under *Daubert* and its progeny, a party proffering expert testimony must show by a "preponderance of proof" that *the expert whose testimony is being offered* is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case, see *Daubert,* 509 U.S. at 592 n. 10, 113 S.Ct. at 2796. Here, the Government has not met its burden at this time. While the court has held that the *Daubert* inquiry is satisfied as it relates to footwear impression evidence as a whole, this court cannot conclude with any certainty until trial whether Pitzen is qualified to offer an expert opinion or whether he has applied the principles and methods discussed herein reliably to the facts of the case. The ultimate question is: can the defendant establish that the footwear impression practices followed in this case are so deficient under the standards described by the Government's witnesses that the testimony must be excluded altogether; or is this simply a matter for cross-examination so that the jury can assess how much weight to give to the purported testimony in this case? Such a conclusion will have to wait until after a supplemental *Daubert* hearing

wherein the court has an opportunity to review Pitzen's proposed testimony. At that time, the court may then be able to make an ultimate determination as to whether Pitzen may offer his expert opinion.[8]

### CONCLUSION

Today this court upholds, as a general principle, the relevance and reliability of the "science"[9] of footwear impression evidence in criminal cases generally. To the extent, Defendant's Motion challenges the admissibility of this evidence on the basis that the general methodology and traditional methods of obtaining footwear impression evidence is never admissible as technical or specialized knowledge under *Daubert* and its progeny, the Motion in Limine is DENIED. A supplemental *Daubert* hearing relating to the specific testimony to be offered by Pitzen at trial will be held on June 13, 2002 at 3:00 p.m.

---

8. This is precisely the trial management technique employed by Judge Pollack in his decision relating to fingerprint evidence. Judge Pollack stated:

At the upcoming trial, the presentation of expert fingerprint testimony by the government, and the presentation of countering expert fingerprint testimony by any of the defendants, will be subject to the court's oversight prior to presentation of such testimony before the jury, with a view to insur-

ing that any proposed expert witness possesses the appropriate expert qualifications and that fingerprints offered in evidence will be of a quality arguably susceptible of responsible analysis, comparison and evaluation.

*Plaza,* 188 F.Supp.2d at 576.

9. The court uses the term "science" loosely as it has noted that this body of impression evidence is more properly classified as technical

or specialized knowledge as opposed to scientific evidence.