# United States Court of Appeals
## For the First Circuit

———————————

No. 05-1492

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL ANTHONY MAHONE,

Defendant, Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

———————————

Before

Lipez and Howard, Circuit Judges,
and Hug,* Senior Circuit Judge,

———————————

Richard L. Hartley for appellant.
F. Mark Terison, Senior Litigation Counsel, United States
Attorney's Office, with whom Paul D. Silsby, United States
Attorney, was on brief, for appellee.

———————————

July 5, 2006

———————————

———————————

*Of the Ninth Circuit, sitting by designation.

**HUG, <u>Senior Circuit Judge</u>:**  Defendant Michael Mahone ("Mahone") appeals his criminal conviction for attempted armed robbery and his restitution sentence for interstate transportation of a stolen motor vehicle.  Mahone argues that the district court erred in admitting footwear impression expert testimony that was key to the jury's attempted robbery verdict, and that the district court abused its discretion in calculating his restitution by undervaluing the stolen vehicle that was recovered.

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), and we affirm the district court.

## I.   STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

On November 10, 2003, a man attempted to rob the Gardiner Federal Credit Union in Maine.  He was armed with a knife and gun and dressed in black.  He wore gloves and a ski mask, with white makeup around the eyes.  Black clothing that Mahone admitted wearing was found in a garbage bag near the credit union.  Mahone's DNA was found on latex gloves, a ski mask, and shoes found near the credit union.  Mahone's fingerprints were found on makeup kits discarded in a nearby dumpster.  Mahone's car was discovered near the credit union.  Three weeks after the robbery, Mahone was found in New Hampshire with a stolen Ford Explorer in his possession.

Prior to Mahone's trial, on June 25, 2004, the district court conducted a daylong hearing on Mahone's motion <u>in</u> <u>limine</u> to exclude Maine State Police Crime Laboratory forensic scientist Cynthia

Homer's testimony that footwear impressions taken inside the credit union matched the shoe found with Mahone's DNA. The district court denied the motion in a comprehensive published order. United States v. Mahone, 328 F. Supp. 2d 77 (D. Me. 2004). The district court accepted Homer as an expert in footwear impression collection and analysis, found her methodology for analyzing footwear impression evidence reliable, and concluded that her proffered testimony was admissible under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Mahone, 328 F. Supp. 2d at 89-92.

At trial, Mahone's counsel raised no objections to allowing Homer's expert testimony, "subject to prior rulings by the court." Homer testified to her opinion that the shoe found with Mahone's DNA had made the impressions found on a stairway and a teller counter inside the credit union.

On October 4, 2004, the jury convicted Mahone of attempted bank robbery and interstate transportation of a stolen vehicle, in violation of 18 U.S.C. §§ 2113 and 2312, respectively. On March 24, 2005, the district court sentenced Mahone. Mahone's sentence included imprisonment and restitution of $5,477.75 for the financial loss borne by the stolen vehicle's insurer. He timely appealed.

## II.  DISCUSSION

### A.  <u>Admission of footwear impression expert testimony</u>

We review the trial judge's decision to admit expert testimony for abuse of discretion.  <u>United States</u> v. <u>Mooney</u>, 315 F. 3d 54, 62 (1st Cir. 2002).  Mahone objected to Homer's testimony by motion <u>in limine</u>, without subsequent, contemporaneous objection at trial.  Under earlier law in this circuit, this would have allowed review only for plain error.  <u>See</u> <u>Clausen</u> v. <u>Sea-3</u>, <u>Inc.</u>, 21 F.3d 1181, 1190 (1st Cir. 1994).  However, under Federal Rule of Evidence 103(a) as amended in 2000, a party need not renew an objection once the court makes a "definitive ruling"  on the record admitting evidence before trial.  In Mahone's case, the district court definitively determined that the expert testimony was "admissible under the standards set forth both in Rule 702 and Daubert." <u>Mahone</u>, 328 F. Supp. 2d at 92.  Mahone's objection was preserved. <u>See</u>, <u>e.g.</u>, <u>Conwood Co.</u> v. <u>U.S. Tobacco Co.</u>, 290 F.3d 768, 792 (6th Cir. 2002).

Before accepting expert testimony, a district court must determine that a witness is "qualified as an expert by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702. Regarding this threshold inquiry, Mahone argues that Homer's qualifications are insufficient, simply because she is not qualified as a footwear examiner through the International Association for Identification (IAI).  This argument has no merit.

The district court did not abuse its discretion.

Homer is sufficiently qualified as an expert. She is a trained forensic professional with a specialty in impressions. She has a masters degree in forensic science. At trial, she stated that she had made more than 11,000 footwear comparisons. She had worked as a "latent impressions" specialist for more than two years and had twice testified in court as an expert in footwear impressions. She had also taken a 40-hour FBI course in footwear and tire impression evidence analysis. She is subject to annual proficiency testing by an outside agency. Although Homer was an active member in the IAI, she lacked the requisite three years' professional experience to qualify for voluntary certification through IAI's footwear analysis program. It is not required that experts be blue-ribbon practitioners with optional certifications. See United States v. Rose, 731 F.2d 1337, 1346 (8th Cir. 1984) (holding, pre-Daubert, that "[a]n expert witness need not be an outstanding practitioner in the field nor have certificates of training in the particular subject").

At the in limine hearing and at trial, Homer thoroughly described the "ACE-V" method (analysis, comparison, evaluation, and verification) for assessing footwear impressions, and described her use of the method in Mahone's case. Mahone argues, however, that the ACE-V method "utterly lacks in objective identification standards" because: 1) there is no set number of clues which

dictate a match between an impression and a particular shoe; 2) there is no objective standard for determining whether a discrepancy between an impression and a shoe is major or minor; and 3) the government provided "absolutely no scientific testing of the premises underlying ACE-V." At issue is Fed. R. Evid. 702(2)'s requirement that an expert may testify if "the testimony is the product of reliable principles and methods." Mahone's arguments lack merit.

From the outset, it is difficult to discern any abuse of discretion in the district court's decision, because other federal courts have favorably analyzed the ACE-V method under <u>Daubert</u> for footwear and fingerprint impressions. <u>See</u> <u>United States</u> v. <u>Allen</u>, 207 F. Supp. 2d 856 (N.D. Ind. 2002) (footwear impressions), <u>aff'd</u>, 390 F.3d 944 (7th Cir. 2004); <u>United States</u> v. <u>Mitchell</u>, 365 F.3d 215, 246 (3d Cir. 2004) (favorably analyzing ACE-V method under <u>Daubert</u> in latent fingerprint identification case); <u>Commonwealth</u> v. <u>Patterson</u>, 840 N.E.2d 12, 32-33 (Mass. 2005) (holding ACE-V method reliable under <u>Daubert</u> for single latent fingerprint impressions).

Even by looking only to the record in the instant case, no abuse of discretion is evident. The district court explicitly considered the four guiding factors laid out as guidance by the Supreme Court in <u>Daubert</u>: 1) whether the underlying method can be or has been tested; 2) whether the method has been subject to peer review and publication; 3) the method's known or potential error

rate; and 4) the level of the method's acceptance within the relevant discipline. See Mahone, 328 F. Supp. 2d at 88-92. Our review of the record confirms that these factors support admissibility of ACE-V. The method has been tested in published studies and has been the subject of widespread publication, including books devoted to footwear impressions, although it is not clear that there have been rigorous peer-reviewed articles. Homer offered a potential error rate of zero for the method, stating that any error is attributable to examiners. Finally, ACE-V is clearly highly accepted in the forensics field; the same method is used for latent impression analysis of fingerprints.

Even if there were cause for concern with the ACE-V method, Daubert emphasized that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596.[1] Under this

---

[1] The First Circuit has noted that:

> Daubert does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process - competing expert testimony and active cross-examination - rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, Daubert . . . demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

analysis, Mahone's argument regarding the lack of a set number of clues required for an ACE-V match must fail. We have rejected a similar argument that a handwriting analysis method impermissibly lacked a standard for the number of similarities required for a match. See United States v. Mooney, 315 F.3d 54, 63 (1st Cir. 2002). Here, as in Mooney, such an argument "misunderstands Daubert to demand unassailable expert testimony." See id.

Not only did Mahone exercise his right to cross-examine Homer at trial regarding the alleged shortcomings in ACE-V, he had the benefit of an earlier Daubert hearing to challenge Homer and ACE-V. Mahone failed to offer his own expert or any other independent evidence revealing reliability concerns with ACE-V or Homer's findings. The district court did not abuse its discretion.

Mahone also raises an argument under Fed. R. Evid. 702(3), which requires that an expert witness have "applied the principles and methods reliably to the facts of the case." Specifically, he argues that there are problems with the verification step of the ACE-V method as applied, because: 1) Homer stated that she had no idea whether the verifying examiner was "blinded" (had not reviewed her report before conducting his examination); and because 2) the government failed to produce the verifying examiner at trial (instead, Homer testified regarding this examiner's background and

Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998).

experience).

The district court did not abuse its discretion. Other federal courts have found ACE-V to be reliable under <u>Daubert</u>, while noting that verification in ACE-V may not be blinded. <u>See</u> <u>United States</u> v. <u>Havvard</u>, 117 F. Supp. 2d 848, 853, 855 (S.D. Ind. 2000) ("[T]he second expert may know from the outset that another examiner has already made the positive identification . . . . [L]atent print identification is the very archetype of reliable expert testimony."), <u>aff'd</u>, 260 F.3d 597 (7th Cir. 2001); <u>Mitchell</u>, 365 F.3d at 239 (noting that although ACE-V verification may not be blinded, it still constitutes "peer review" that favors admission of the method).

At most, Mahone's first verification argument goes only to weight, not admissibility, under <u>Daubert</u> and <u>Ruiz-Troche</u>. There is no evidence that ACE-V mandates blinded verification. Under cross-examination by Mahone's trial counsel, Homer acknowledged only "a lot of debate" over whether a verifying examiner should be blinded.

Mahone's argument regarding the government's failure to produce the verifying expert at trial does not actually contest the application of the ACE-V method; Mahone does not assert that there was no verification of Homer's findings. Instead, Mahone objects to the government's litigation approach of not presenting the verifying expert as a trial witness. If Mahone intended a hearsay challenge, however, he waived it by failing to make any such

argument in his opening brief.  See <u>Sullivan</u> v. <u>Neiman Marcus Group, Inc.</u>, 358 F.3d 110, 114 n.1 (1st Cir. 2004).

**B.    The district court's restitution calculation**

We review restitution orders for abuse of discretion and subsidiary findings of fact for clear error.  See <u>United States</u> v. <u>Burdi</u>, 414 F.3d 216, 221 (1st Cir. 2005).

As part of his sentence for interstate transportation of a stolen vehicle, Mahone was ordered to pay $5,477.75 in restitution to an insurance company.  The insurer had compensated the vehicle's owner $6,227.75, and later received $750 for selling the vehicle after it was recovered by police.  The vehicle was missing for nearly a month before its recovery.

The district court's calculation was made under a provision of the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A(b)(1), which directs that restitution be equal to the original value of the property less "the value (as of the date the property is returned) of any part of the property that is returned."  The parties stipulated that $6,227.75 represented the original value of the vehicle, a 1996 Ford Explorer.  Mahone argues that the vehicle's value as of the date it was returned is far higher than $750.  He notes that the Kelley Blue Book "suggested retail value" for such a vehicle is $5,760.[2]  Mahone argues that

---

[2] Mahone also notes that the police incident report for the vehicle's recovery lists its condition as good and its value as $5,000.

$750 is "simply the amount for which the vehicle was sold," and that the government "produced absolutely no evidence that this figure even approaches this vehicle's value at the time of its recovery."

At sentencing, the district court acknowledged "the rather extreme variation" between $5,760 and $750, but stated, "[I]t's more likely than not that the value was actually the value reflected in the price that the insurance company paid and received as a consequence of its dealings with the automobile." The district court then explained:

> I take it as a given that the insurance company is not in the business of paying to its insureds more money than the value of the vehicles it has insured. And I also take it as a given that the insurer has every incentive to receive full value for any vehicle that it receives title to that has been damaged or stolen. In this case, absent some information that . . . [the insurer's] sale of the vehicle was conducted under less than optimal circumstances, the court really has to conclude that the $750 for whatever reason is what [the insurer] could have received on the date of sale since it is what it did in fact receive.
>
> Otherwise, the court is left to speculate on the condition of the vehicle, the impact that its being stolen may have on its value, the impact of its being held in police custody for an extended period of time . . . and absent some indication that the auction or sale . . . was not fair market value and circumstances that would indicate another value, I am going to accept [the $750 figure].

As the district court noted, the government <u>did</u> produce evidence of the vehicle's value – the price for which it was actually sold upon recovery. The seller insurer had, moreover, a

common-sense incentive to regain as much as possible of the $6,277.75 it had given to its insured for the original theft of the vehicle.

We recently held, moreover, that "absolute precision is not required" in calculating restitution under the MVRA. Burdi, 414 F.3d at 221. In interpreting the MVRA, Burdi looked to our analysis of the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663, a separate restitution statute with an identical restitution calculation method and other close similarities to the MVRA. United States v. Vaknin, 112 F.3d 579 (1st Cir. 1997).[3] Vaknin concluded that only "a modicum of reliable evidence" is required to establish a restitution award; "an award cannot be woven solely from the gossamer strands of speculation and surmise." Id. at 587. Vaknin added that "the legislative history [for the VWPA] clearly signals a congressional preference for rough remedial justice, emphasizing victims' rights." Id. Specifically, Vaknin held that Congress intended to authorize expeditious and reasonable

---

[3] Because the VWPA and the MVRA have identical restitution calculation language, Burdi reasoned, "it is appropriate for us to turn to Vaknin for guidance" in interpreting the MVRA. 414 F.3d at 221 n.6 (internal quotation omitted).

Several other circuits have noted the very strong similarities between the two statutes. As a result of this similarity, "courts interpreting the MVRA may look to and rely on cases interpreting the VWPA as precedent." United States v. Gordon, 393 F.3d 1044, 1048 (9th Cir. 2004). Because of the statutes' similarity, "court decisions interpreting the language of the VWPA are helpful in construing the language of the MVRA." United States v. Randle, 324 F.3d 550, 556 n.3 (7th Cir. 2003).

calculations of restitution "by resolving uncertainties with a view towards achieving fairness to the victim," rather than by requiring that district courts exercise "great precision in fixing the amount of restitution due." Id.

Relying on Vaknin's interpretation of the VWPA, and applying it to the identically-worded restitution calculation language in the MVRA, we conclude that the district court made a proper determination of the restitution due by using the actual selling price of the vehicle and correctly emphasizing the victim insurer's rights.[4]

**CONCLUSION**

The district court did not abuse its discretion in admitting the footwear impression expert testimony. In addition, it did not abuse its discretion in calculating Mahone's restitution.

**AFFIRMED.**

---

[4] Examining the legislative history of the MVRA reveals that Congress clearly intended that it build on the victim protections of the VWPA, which was enacted in 1982:

> [W]hile significant strides have been made since 1982 toward a more victim-centered justice system, much progress remains to be made in the area of victim restitution.
> . . . .
> The committee believes that the need for finality and certainty in the sentencing process dictates that [the restitution] determination be made quickly.

S. Rep. No. 104-179, at 13, 20 (1995), reprinted in 1996 U.S.C.C.A.N. 924, 926, 933.

-13-