**THE STATE OF NEW HAMPSHIRE**

HILLSBOROUGH, SS                                      **SUPERIOR COURT**
NORTHERN DISTRICT

Vermont Telephone Company, Inc.

v.

FirstLight Fiber, Inc.

Docket No. 216-2020-CV-00312

## ORDER ON DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT

Plaintiff Vermont Telephone Company, Inc. ("VTel") brought this action against Defendant FirstLight Fiber, Inc. ("FirstLight") arising out of FirstLight's termination of the parties' contract. Plaintiff's amended complaint alleges claims for breach of contract (Count I) and breach of the implied covenant of good faith and fair dealing (Count II). Defendant filed a counterclaim for breach of contract. FirstLight now moves *in limine* to exclude VTel from introducing Brian Pitkin's expert testimony about VTel's alleged damages at trial. (Doc. 156.) VTel objects. (Doc. 162.) Both FirstLight (Doc. 166) and VTel (Doc. 169) further respond. The Court held a hearing on July 31, 2023. For the reasons set forth below, FirstLight's motion to exclude is DENIED.

The Court incorporates the facts set forth in the Court's January 3, 2023 summary judgment order. (Doc. 144.) By way of further background, the parties entered into a Dark Fiber Lease Agreement (the "Lease") in 2014 which provided VTel with access to a dark fiber route (the "Route") between Lebanon, New Hampshire and Boston, Massachusetts. FirstLight terminated the Lease, effective December 14, 2019.

VTel retained Pitkin from FTI Consulting ("FTI") as its expert to determine the damages VTel suffered as a result of FirstLight's alleged breach of the Lease. Pitkin is

the senior managing director of FTI's telecommunications group. (Pl.'s Ex. 1 ¶ 5.) Pitkin has worked in the telecommunications industry for over twenty-five years and has regularly testified in front of state and federal courts, the Federal Communications Commission, and state regulatory commissions. (*Id.*) As part of his experience, Pitkin routinely completes and evaluates detailed business case analyses to help support damage claims. (*Id.*)

Pitkin completed his expert report on July 9, 2021. VTel's counsel instructed Pitkin to complete his report assuming the following two things: (1) FirstLight wrongfully terminated the Lease effective December 14, 2019 and (2) VTel would have started using the fiber route in 2020 to pursue additional business opportunities. (*Id.* ¶ 8.) Pitkin divided his report into three sections: (1) an analysis of VTel's business opportunities over a five-year period; (2) extension of the business opportunities through the end of the Lease; and (3) the financial damages that VTel suffered as a result of the lost opportunities. (Id. ¶ 9.) Ultimately, Pitkin concluded that VTel's lost profits ranged from $10.4 million to $43.9 million, with a mean outcome of $27.2 million. (*Id.* ¶ 10.)

Pitkin authored a rebuttal report on June 15, 2022, in response to criticisms from FirstLight's expert, Kenneth Martin. (Pl.'s Ex. 2 at 1.) Martin works for the consulting firm Altman Solon and has worked in the telecommunications industry for over twenty-four years. Pitkin's rebuttal report largely upheld the analysis and findings of his initial report. (*Id.*) Specifically, Pitkin rejected Martin's criticisms that (1) Pitkin's initial report was too speculative, (2) Pitkin misunderstood the Lease, (3) Pitkin should have used historical data, and (4) Pitkin relied on unreasonable assumptions, to be unfounded. (*Id.* at 2.) In his rebuttal report, Pitkin agreed that he initially overlooked the cost of

additional equipment that VTel would need to use to realize its potential business opportunities and accordingly revised his estimate of damages down to $24.7 million. (*Id.* at 29.)

FirstLight now moves to exclude Pitkin's expert testimony for a variety of reasons. Broadly, FirstLight argues that Pitkin's damage calculations "are not sufficiently reliable or properly moored to actual facts to qualify as expert testimony." (Doc. 158 at 1.) More specifically, FirstLight argues that: (1) there is no evidence that VTel would have actually pursued the additional business opportunities upon which Pitkin focused; (2) Pitkin modeled VTel's telecom market share rather than using data from VTel's actual markets; (3) the industry estimations which Pitkin relied upon are unreliable; and (4) Pitkin made flawed assumptions in calculating VTel's long haul opportunities between Montreal and Boston. (*Id.* at 1–2.) Therefore, FirstLight argues, Pitkin's testimony is inadmissible under New Hampshire Rules of Evidence 702 and 403 because it would be unreliable and highly prejudicial. VTel argues that Pitkin's report and testimony are sufficiently reliable and that FirstLight's arguments go to the weight of the evidence, which is left to the jury to determine. (Doc. 162 ¶ 3.) VTel also contends that Pitkin's testimony is not too speculative because he properly conducted a lost future profits analysis. (*Id.* ¶ 4.)

Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." "Expert witnesses are called to give their opinions on subjects about which they have special knowledge and

experience, upon the assumption that, by reason of these qualifications, they will be able to assist the jury in its search for the truth." *Brown v. Bonnin*, 132 N.H. 488, 494 (1989).

"[E]xpert testimony must rise to a threshold level of reliability to be admissible." *Baker Valley Lumber, Inc. v. Ingersoll-Rand Co.*, 148 N.H. 609, 614 (2002). In determining the reliability of an expert's testimony, the court in *Baker Valley* adopted the framework set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The State legislature has since codified this framework in RSA 516:29-a, which states:

> I. A witness shall not be allowed to offer expert testimony unless the court finds:
> > (a) Such testimony is based upon sufficient facts or data;
> > (b) Such testimony is the product of reliable principles and methods; and
> > (c) The witness has applied the principles and methods reliably to the facts of the case.
> II. (a) In evaluating the basis for proffered expert testimony, the court shall consider, if appropriate to the circumstances, whether the expert's opinions were supported by theories or techniques that:
> > (1) Have been or can be tested;
> > (2) Have been subjected to peer review and publication;
> > (3) Have a known or potential rate of error; and
> > (4) Are generally accepted in the appropriate scientific literature.
> (b) In making its findings, the court may consider other factors specific to the proffered testimony.

Under this analysis, "[t]he trial court functions only as a gatekeeper, ensuring a methodology's reliability before permitting the fact-finder to determine the weight and credibility to be afforded an expert's testimony." *Baker Valley*, 148 N.H. at 616. "While the proponent of the expert witness bears the burden of proving the admissibility of the expert's testimony, this burden is not especially onerous." *Szewczyk v. Cont'l Paving, Inc.*, __ N.H. __, __ (decided August 16, 2023) (slip op. at 8). "The overall purpose of Rule 702 and RSA 516:29-a is to ensure that a fact-finder is presented with reliable

4

and relevant evidence, not flawless evidence." *Id.* "[A]s long as an expert's scientific testimony rests upon good grounds, . . . it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *State v. Langill*, 157 N.H. 77, 88 (2008).

As a preliminary matter, the Court notes that it found Pitkin to be credible. Pitkin provided clear and articulable reasons to support specific decisions that he made throughout his report. For example, Pitkin testified that he identified six potential business opportunities along the fiber route that VTel could have taken advantage of if FirstLight never terminated the Lease. However, Pitkin further testified that he only included two of them—enterprise and long haul opportunities between Boston and Montreal—in his damages estimation. Pitkin's knowledge and detailed rationale for limiting the scope of his report's analysis from the outset highlights his expertise and methodology. Additionally, Pitkin coherently engaged with the criticism of his report and readily admitted when he believed he made a mistake in his original report, further emphasizing Pitkin's knowledge and understanding of the telecommunications industry.

Broadly, the Court agrees with VTel that the true gist of FirstLight's arguments goes to the weight and not the reliability of Pitkin's testimony. Crucially, expert testimony need not be perfect to be reliable under Rule 702. *See Szewczyk*, __ N.H. at 8. The Court agrees that Pitkin's testimony is not flawless, especially the data that Pitkin used from Montpelier, Vermont. Nevertheless, Pitkin relies on methods and facts that are "generally accepted" in the telecommunications industry. *Moscicki v. Leno*, 173 N.H. 121, 125 (2020) ("RSA 516:29-a, II requires courts to consider whether the

5

proffered testimony is based upon theories or techniques that are <u>generally accepted</u>; it does not require courts to exclude testimony where the testimony is not supported by the theory or technique that has the <u>most</u> acceptance."). Indeed, Pitkin credibly testified, for example, it was standard practice in the telecommunications industry to use industry models rather than historical company data. There are no bright line rules for determining the admissibility for expert testimony as courts instead must focus on whether the underlying facts or methodologies are reliable. *See id.* (declining to adopt a bright-line rule that a specific generally accepted methodology in toxic torts cases must be used as long as another generally accepted methodology is). The Court will now turn to FirstLight's specific grievances to demonstrate why Pitkin's testimony is sufficiently reliable under Rule 702 and RSA 516:29-a, II.

The Court addresses FirstLight's contention that the basis for Pitkin's analysis was flawed because there was no indication that VTel would have utilized splices along the Route. Putting aside the unresolved legal question of how many data splices would be allowed under the Lease,[1] the Court finds that the basis of Pitkin's report is not so speculative as to render his opinion unreliable. Forecasting lost profits, which is an accepted form of damages, inherently requires a degree of speculation. *See Boyle v. City of Portsmouth*, 172 N.H. 781, 792 (2020) (stating that "while absolute certainty" is not required to support a lost profits damages award, "damages cannot be awarded for speculative losses."). Here, given the existence and length of the Lease, including the Lease's provision allowing for splices along the Route and the unique opportunities that dark fiber presents, Pitkin had a factual basis upon which to reliably forecast that VTel

---

[1] At the July 31, 2023 hearing, the parties stated that they will file separate motions to determine how many, if any, splices along the fiber route that VTel would have been entitled to.

would have engaged in additional business opportunities had FirstLight not terminated the Lease.  *See Stachulski v. Apple New England, LLC*, 171 N.H. 158, 164–65 (2018) (finding that expert testimony had sufficient facts that the defendant's hamburger caused the plaintiff's food poisoning where the circumstantial evidence that ruled out other possible causes of the plaintiff's illness).

This is not a situation where Pitkin relied exclusively on historical profits to anticipate future profits or where FirstLight presented evidence beyond challenging Pitkin's methodologies that VTel would not earn the profits that Pitkin estimated.  *See Bezanson v. Hampshire Meadows Dev. Corp.*, 144 N.H. 298, 304–06 (1999) (rejecting plaintiff's lost profit analysis because there was no evidence in the record demonstrating how the plaintiff' s historical profits in one year would translate to the future).  Thus, the fact that VTel had not begun utilizing additional opportunities along the Route does not automatically render Pitkin's analysis too speculative to be reliable.  *See Boyle*, 172 N.H. at 792; *Bezanson*, 144 N.H. at 304–06.

Next, FirstLight also takes issue with Pitkin's decision to use industry forecasts rather than VTel's historical data to predict its future income.  (Doc. 158 at 5–6.)  More specifically, FirstLight contends that the amount of estimated revenue VTel would have obtained cannot be verified due to the manner in which Pitkin calculated the value of the telecom market in the twenty markets he identified.  (Pl.'s Ex. 1 at 16); (Doc. 158 at 5–6.)  At the hearing, Pitkin explained in detail why he used industry benchmarks and databases to forecast the revenue VTel would have expected to earn if it took advantage of opportunities along the fiber route.

7

More specifically, FirstLight contends that the manner in which Pitkin calculated the amount of telecom market in each of the twenty markets he identified (Pl.'s Ex. 1 at 16) was unreliable and thus claims that the amount of the estimated revenue from the markets cannot be verified. (Doc. 158 at 5–6.) During the July 31 hearing, Pitkin testified that he utilized GeoTel and S&P Capital IQ to help model VTel's lost business opportunities along the fiber route by providing customer information in the twenty identified markets to forecast lost profits. Pitkin further testified at length about his decision to use modeled data rather than historical VTel data to model the amount VTel would have likely made had FirstLight not terminated the Lease. Pitkin explained that historical data does not provide the same level of information as the benchmarks he utilized instead. He further articulated that using historical VTel data would make his analysis unreliable because he would be using inconsistent data sets, making his analysis "an apples to oranges" comparison. Pitkin opined that such a comparison would be "meaningless" because the amount that an actual customer spends on telecom services contemplates a different analysis than GeoTel's database that includes average customer telecom spend. (H'rg 10:52.)

The Court finds that FirstLight's arguments attempt to undermine the weight of Pitkin's testimony rather than its reliability. Pitkin credibly testified that he used the indexes and benchmarks consistent with the way they are commonly used throughout the telecommunications industry. In fact, Pitkin explained that Altman Solon uses the same databases in a similar manner. This demonstrates that although FirstLight may quibble with the specific way in which Pitkin used the GeoTel or S&P Capital IQ databases, Pitkin nevertheless used generally accepted methods. *See Moscicki*, 173

N.H. at 125. Any concerns that FirstLight has about how Pitkin used these databases to arrive at his ultimate damages calculation can be addressed on cross-examination at trial. *See Langill*, 157 N.H. at 88.

The Court acknowledges that FirstLight's expert disagrees with Pitkin's methodology, explaining that using historical VTel data would create a more reliable damages determination than Pitkin's use of GeoTel data. However, this strikes the Court as the kind of challenge best left to cross-examination. *Id.* FirstLight's arguments do not demonstrate that Pitkin's use of industry databases is not a generally accepted practice in the telecommunications industry. *See Moscicki*, 173 N.H. at 125. In fact, the evidence presented shows the opposite to be true. Because Pitkin used a generally accepted method, his methodology is sufficiently reliable to allow the jury to hear and assess it. *Langill*, 157 N.H. at 88.

FirstLight next takes issue with Pitkin's analysis of VTel historical data from Montpelier, Vermont. Specifically, FirstLight contends that the inconsistencies between the industry benchmark data for Montpelier ($92,615) and VTel's actual wallet share of telecom spend in Montpelier ($9,600) demonstrates Pitkin's unreliability because Pitkin's calculations artificially inflated VTel's damages. (Doc. 158 at 13.) Pitkin explained that he used Montpelier as a focal point in his analysis because it is the one market where VTel has a pre-existing customer base. Pitkin further articulated that his analysis was not trying to show the pre-existing wallet share but was rather trying to establish a baseline to consistently compare against other industry benchmarks.

FirstLight spent significant time during the July 31 hearing going through Pitkin's projected telecom spend that he calculated for Montpelier. In FirstLight's estimation, the

9

data Pitkin relied upon was unreliable because of various irregularities including categories that had no customers or duplicate entries. Overall, FirstLight's objections to Pitkin's methodology about Montpelier echo its problems with Pitkin's use of industry recognized benchmarks. Pitkin emphasized in his rebuttal report that he estimated VTel's fair market share in Montpelier based off of VTel's pre-existing customer base in order to have a consistent set of data upon which to calculate VTel's estimated damages. (Pl.'s Ex. 2 ¶¶ 56–57.)

The Court finds that FirstLight's arguments again go towards the weight of the evidence rather than its reliability. As the Court addressed above, Pitkin's use of widely recognized industry databases is a regularly accepted industry practice. *See Langill*, 157 N.H. at 88. To the extent that FirstLight contends that Pitkin should have used another method instead, the Court is not persuaded because the methodology that Pitkin used is nevertheless generally accepted in the telecommunications industry. *See Moscicki*, 173 N.H. at 125. Pitkin credibly testified that although he used VTel's existing customer base, he modeled the customer data accordingly so he could properly compare it with the other identifiable markets. The Court finds this to be in harmony with the generally accepted methods Pitkin used to calculate expected profits from the other twenty identifiable markets. *See id*.

Presently, there is enough evidence in the record demonstrating that Pitkin's methodology was reliable even if there is other evidence in the record suggesting that Pitkin's data set was potentially flawed. *See Szewczyk*, __ N.H. at 8 (concluding that an expert's testimony that a damaged polyethylene liner likely caused flooding was admissible despite the fact that there was no evidence in the record documenting that

the liner was damaged or defective). Ultimately, because Pitkin's methodology in using the Montpelier case study is reliable, any unresolved questions is best left for the jury. *Cf. Beckles v. Madden*, 160 N.H. 118, 128 (2010) (acknowledging that lay witnesses could provide needed factual context for expert testimony which should be best left for the jury to consider).

Additionally, FirstLight also maintains that Pitkin's testimony is unreliable because of errors in modeling lost profits along a long haul fiber route between Montreal and Boston. FirstLight asserts that there would be more robust competitors than what Pitkin relied upon in his modeling, thus making his conclusion that the best case scenario of VTel capturing twenty percent of the market unreliable. (Doc. 158 at 15). Lastly, FirstLight also questions VTel's desire and preparation to develop the long haul market in the first place. (*Id.*) Pitkin explained at the hearing that VTel had no Canadian data available to examine long haul opportunities available in Montreal. Thus, Pitkin used United States cities based on similar population characteristics as a proxy because in his experience United State cities have similar telecom data to Canadian cities. VTel argues that FirstLight merely demonstrated that FirstLight's expert disagreed with Pitkin's calculations and used a different model but failed to show why Pitkin's model was unreliable. (Doc. 162 at 27–28.)

The Court agrees with VTel. It is clear that FirstLight's expert disagrees with Pitkin's analysis. However, a mere disagreement between experts where both experts rely on generally accepted methodologies is not sufficient to exclude Pitkin as an expert. *Cf. Moscicki*, 173 N.H. at 125. Pitkin utilized GeoTel data to approximate Canadian data. The Court above has already found that Pitkin's utilization of industry benchmarks

11

and databases is a generally accepted methodology in the telecommunications industry. Additionally, the Court finds Pitkin, with all of his experience, to be credible when he testified that data from American cities is similar enough to Canadian cities to serve as a reliable proxy. Additionally, similar to the Court's previous analysis on the speculative nature of Pitkin's testimony, Pitkin's reliance on the unique opportunities that the Route presented to VTel demonstrates that Pitkin's analysis of the long haul opportunities had a basis in the record. (Pl.'s Ex. 2 ¶ 50); *see Bezanson*, 144 N.H. at 304–06. Simply put, FirstLight's questions about the soundness of Pitkin's methodology compared to Martin's methodology goes to the weight of Pitkin's testimony and should be left for a jury to decide. *Langill*, 157 N.H. at 88.

Likewise, the Court finds the rest of Pitkin's analysis to fall within generally accepted industry standards. At the hearing, Pitkin explained that after he completed the above business case analyses, he engaged in standard forecasting models that he testified are easily reviewable on multiple levels. The Court agrees, especially with the fact that Pitkin used industry accepted data that is from readily accessible databases. The heart of FirstLight's challenges to Pitkin stems from its belief that his attempt to calculate any degree of damages for business opportunities that where there was no proof that VTel would every realize these opportunities is too speculative. As the Court touched on above, damages calculations have to "address a hypothetical world that never existed, one in which other things remained the same but the breach had not occurred." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 968 (9th Cir. 2013). Thus, especially in the context of a pre-existing venture branching into new opportunities afforded to them by a terminated contract, forecasting what revenue VTel

12

could have owned based off of pre-existing models is not prohibitively speculative. *Id.* at 969–70 (finding an expert's general methodology of "comparing the unknown to an analogous known experience" to be reliable).

Ultimately, the Court disagrees with FirstLight's contention that Pitkin's methodology was so unreliable as to create biased and "garbage" results. (H'rg 11:28.) VTel has carried its burden to show that Pitkin's testimony meets the threshold requirement for reliability. To be sure, Pitkin is not a flawless witness, but he is not required to be. FirstLight's proper recourse to challenge Pitkin's reliability is to cross-examine him, especially pertaining to the differences in approaches and methodologies between him and Martin. *Langill*, 157 N.H. at 88. The Court is not persuaded that allowing Pitkin to testify would be unfairly prejudicial to FirstLight because it will have an opportunity to cross-examine Pitkin and to call its own expert to attempt to sway the jury to its side. Were the Court to side with FirstLight here, the Court would exceed its gate-keeping function. *See Szewczyk*, __ N.H. at 9. Therefore, Pitkin's testimony is admissible under Rule 702 and RSA 516:29-a.

Conclusion

Accordingly, for the foregoing reasons, the Court DENIES FirstLight's motion. SO ORDERED.

September 5, 2023

David A. Anderson
Associate Justice

Clerk's Notice of Decision
Document Sent to Parties
on  09/05/2023