NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2022-0101


ANDREW SZEWCZYK & a.

v.

CONTINENTAL PAVING, INC. & a.


Argued: November 17, 2022
Opinion Issued: August 16, 2023

McDowell & Morrissette, P.A., of Manchester (Mark D. Morrissette and Joseph F. McDowell, III on the brief, and Mark D. Morrissette orally), for the plaintiffs.

Desmarais Law Group, PLLC, of Manchester (Debra L. Mayotte on the brief), for defendant Continental Paving, Inc.

Primmer Piper Eggleston & Cramer PC, of Manchester (Gary M. Burt and Brendan D. O'Brien on the brief, and Gary M. Burt orally), for defendant Bellemore Property Services, LLC.

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Emily C. Goering, assistant attorney general, on the brief and orally), for defendant New Hampshire Department of Transportation.

HICKS, J.  The plaintiffs, Andrew Szewczyk and Marian Szewczyk, appeal the following orders of the Superior Court (Nicolosi, J.): (1) an order granting the motion to dismiss filed by defendant New Hampshire Department of Transportation (DOT); (2) orders striking the plaintiffs' expert reports; and (3) an order granting the motions for summary judgment filed by defendants Bellemore Property Services, LLC (Bellemore) and Continental Paving, Inc. (Continental).  We affirm the order granting DOT's motion to dismiss, and reverse the orders striking the expert reports and granting the motions for summary judgment.

I.      Facts

The following facts are drawn from the trial court orders and from the evidence presented to the trial court.  Because the plaintiffs appeal orders granting a motion to dismiss and motions for summary judgment, we recite the facts in the light most favorable to the plaintiffs.  See Cluff-Landry v. Roman Catholic Bishop of Manchester, 169 N.H. 670, 673 (2017) (reciting standard for motion to dismiss); Zannini v. Phenix Mut. Fire Ins. Co., 172 N.H. 730, 733-34 (2019) (reciting standard for summary judgment).

On the evening of October 21, 2016, the plaintiffs were injured in a motor vehicle accident on Route 3 in Nashua.  While driving southbound near exit 4, they encountered significant flooding in the left-hand travel lane of the highway, and the vehicle they were traveling in hydroplaned.  After the plaintiffs stopped and got out of their car, a second vehicle hydroplaned and struck the plaintiffs' vehicle, which then struck and injured the plaintiffs.  When the police arrived at the scene, they discovered that the flooding had been caused by a clogged catch basin.  At the time of the accident, Continental was repaving Route 3 pursuant to a contract with DOT.  Continental had subcontracted with Bellemore to clean the catch basins along Route 3.

A catch basin consists of a cast iron metal frame, a top grate, and, in most cases, a polyethelyne liner.  The liners used in the project were provided by Continental and consist of two parts that were welded together by a Continental employee.  The first part of the liner is a four-foot square top that sits over the entrance to the catch basin.  The second part is a cylindrical twenty-inch diameter downspout underneath the first part that extends one foot into the catch basin.  Cleaning the catch basins after paving was completed involved passing a metal pipe through the catch basin opening and

2

through the polyethelene liner to vacuum out any debris that had collected in the bottom of the catch basin.

The plaintiffs filed a complaint against DOT, Continental, and Bellemore alleging that the three defendants collectively undertook a repaving and drainage system rehabilitation project and that their combined and individual negligence caused the flooding, which caused the motor vehicle crash that injured the plaintiffs. Shortly after the complaint was filed, DOT filed a motion to dismiss the single count that had been brought against it, arguing that the plaintiffs' complaint failed to state a claim because the plaintiffs failed to meet the pleading requirements of RSA 230:80, II (2009). The trial court granted the motion to dismiss, and later denied the plaintiffs' motion to reconsider.

Thereafter, Continental and Bellemore filed motions for summary judgment and motions to strike the opinions of the plaintiffs' expert, highway engineer Thomas Broderick. Following a hearing, the trial court found that Broderick's opinion regarding the cause of the clogging of the catch basin was "based entirely on pure speculation without any factual support," and granted the motion to strike Broderick's expert report, but also granted the plaintiffs leave to supplement their objections to the motions for summary judgment. The plaintiffs filed a supplemental objection, and submitted with it, among other things, an expert report written by a hydrologic/hydraulic engineer, Richard Murphy. Thereafter, the trial court declined to consider Murphy's opinion on causation and granted the defendants' motions for summary judgment. The trial court denied the plaintiffs' motion to reconsider the order, and the plaintiffs appealed.

At issue on appeal are whether the trial court erred when it granted: (1) DOT's motion to dismiss after finding that it was immune from liability pursuant to RSA 230:78-:80 (2009); (2) the defendants' motions to strike the opinions of the plaintiffs' experts; and (3) the defendants' motions for summary judgment.

II. Analysis

A. DOT's Motion to Dismiss

The plaintiffs' complaint asserted one count of negligence against DOT. The complaint alleged that DOT was "actively involved" in resurfacing the central turnpike from Nashua to Concord, including the area of the October 21, 2016 accident. It further alleged that DOT "knew or should have been aware of the flooding and clogging of the catch basins," and that it "had the affirmative duty to maintain the highway in a reasonably safe condition, and to repair any defect or known hazards."

3

DOT moved to dismiss, arguing that it is immune from liability pursuant to RSA 230:78-:80. The trial court granted DOT's motion and denied the plaintiffs' motion to reconsider.

In reviewing a trial court's ruling granting a motion to dismiss, we consider whether the allegations in the plaintiffs' pleadings are reasonably susceptible of a construction that would permit recovery. Cluff-Landry, 169 N.H. at 673. We assume the truth of the facts as alleged in the plaintiffs' pleadings and construe all reasonable inferences in the light most favorable to the plaintiffs. Id. We need not, however, assume the truth of statements in the plaintiffs' pleadings that are conclusions of law, id., and will uphold the granting of a motion to dismiss if the facts pled do not constitute a legal basis for relief. Beane v. Dana S. Beane & Co., 160 N.H. 708, 711 (2010). For the reasons that follow, we conclude that the plaintiffs have not pled facts sufficient to constitute a legal basis for relief, and that DOT is immune from liability pursuant to RSA 230:78-:80.

RSA 230:80, I, provides, in relevant part, that DOT "shall not be held liable for damages in an action to recover for personal injury or property damage arising out of its construction, maintenance, or repair of public highways . . . unless such injury or damage was caused by an insufficiency, as defined by RSA 230:78." RSA 230:80, I. A highway is "insufficient" if it is: (1) not passable in any safe manner; or (2) "[t]here exists a safety hazard which is not reasonably discoverable or reasonably avoidable by a person who is traveling upon such highway" in a lawful manner. RSA 230:78. RSA 230:80, I, also provides, in relevant part, that DOT "shall not be held liable for damages in an action to recover for personal injury or property damage arising out of its construction, maintenance, or repair of public highways" unless caused by an "insufficiency" and:

(a) The department of transportation received a notice of such insufficiency as set forth in RSA 230:78, but failed to act as provided by RSA 230:79; or

(b) The commissioner of the department of transportation who is responsible for maintenance and repair of highways or highway bridges, had actual notice or knowledge of such insufficiency, by means other than notice pursuant to RSA 230:78 and was grossly negligent or exercised bad faith in responding or failing to respond to such actual knowledge; or

(c) The condition constituting the insufficiency was created by an intentional act of an employee acting in the scope of his official duty while in the course of his employment, acting with gross negligence, or with reckless disregard of the hazard.

4

RSA 230:80, I.

The plaintiffs argue that the "insufficiency" on the roadway was not the flooding, but rather, the clogged catch basin. DOT counters that the insufficiency was the excessive water on the road at the time of the accident. We agree with the trial court that it is unnecessary to resolve this question because, in either case, the plaintiffs' complaint does not allege that a notice of insufficiency, consistent with RSA 230:78, I, was provided to DOT, or that the commissioner had actual notice or knowledge of the insufficiency prior to the accident. The plaintiffs argue that notice can be imputed to DOT because DOT is the owner of the highway and the architect of the construction project, it oversaw the construction work, it was required to approve and accept the work done, and it did not properly test the systems after the project was completed. The plaintiffs also argue that the defendants "created a plain and foreseeable hazard," and that, therefore, "no independent 'notice' of same is called for." We disagree.

The same reasoning that led us to reject the "naked legal conclusion that the State must have had notice based on the State's responsibility for highway maintenance" in Bowden v. Commissioner, New Hampshire Department of Transportation, 144 N.H. 491, 499 (1999), applies in this case. The plaintiffs' theory of liability in Bowden assumed that because the defect that led to the motorcycle accident in that case must have existed for some period of time, the State would, in the course of its construction, inspection, maintenance and repair functions on public highways, have received either actual or constructive notice of the defect. Bowden, 144 N.H. at 499. We rejected the plaintiffs' reading of the statute, and held that "[a]bsent a claim of actual notice of an alleged or actual defect prior to the injury, there can be no liability under RSA 230:80, I(a)-(b)." Id. The plaintiffs' reading of the statute in this case, like the plaintiffs' reading of the statute in Bowden, would have the effect, as DOT pointed out at oral argument, of imputing to DOT actual knowledge of every condition on every stretch of state-owned and state-maintained roadway in the State, and would undermine what RSA 230:78-:80 is intended to do. See id. at 495 (observing that in adopting RSA 230:78-:80, the general court noted that "it is, therefore, unreasonable to expect that all highways . . . will be routinely patrolled or subject to regular preventative maintenance, or that all such highways . . . should be constructed and maintained to any uniform standards" (quotation omitted)).

Nor does the plaintiffs' complaint allege that a DOT employee, "acting in the scope of his official duty while in the course of his employment," acted "with gross negligence, or with reckless disregard of the hazard." RSA 230:80(c). The plaintiffs did not plead gross negligence or reckless disregard in their complaint. The complaint does not identify any particular DOT employee who caused or contributed to causing the clogging or flooding and only generally asserts: (1) that "the catch basins in the drainage systems were

5

deficient, as a result of the negligence of the New Hampshire Department of Transportation, its agents, its employees and its contractors"; and (2) that the plaintiffs were injured as a result "of the negligent inspection, negligent oversight, negligent hiring, and Department of Transportation's failure to have tested" the catch basins and the changes to the hydraulics of the drainage systems. We agree with the trial court that these statements, on their face, do not allege gross negligence or reckless disregard, but, rather, sound in ordinary negligence, and that they fail to satisfy the pleading requirement in RSA 230:80 that the complaint describe with particularity an intentional act of a DOT employee which created the alleged insufficiency.

To the extent that the plaintiffs argue that RSA 228:5-a (2009) should alter our analysis of whether the plaintiffs have met the pleading requirements of RSA 230:78-:80, we disagree. RSA 228:5-a states that "performance of contracts for all state transportation projects shall be inspected to assure compliance with the plans and specifications," and identifies several methods by which DOT can accomplish this. RSA 228:5-a is included in the chapter titled, "Administration of Transportation Laws," which relates to the administrative aspects of contracting, funding, and working with DOT. We do not read the statute as providing a mechanism for a third party to seek damages or maintain a cause of action against DOT for its alleged failure to inspect a State transportation project.

B. The Motions to Strike Expert Reports and for Summary Judgment

The plaintiffs next argue that the trial court erred when it concluded that no genuine issues of material fact exist that would support the plaintiffs' actions for negligence against defendants Continental and Bellemore. To succeed on their negligence claims against those two defendants, the plaintiffs must demonstrate that the defendants owed a duty to them, that the defendants breached that duty, and that the breach proximately caused injury to them. Bloom v. Casella Constr., 172 N.H. 625, 627 (2019). The proximate cause element involves both cause-in-fact and legal cause. 101 Ocean Blvd., LLC v. Foy Ins. Grp., Inc., 174 N.H. 130, 144 (2021). Cause-in-fact is also called "but for" causation, and "requires the plaintiff to produce evidence sufficient to warrant a reasonable juror's conclusion that the causal link between the negligence and the injury probably existed. Legal cause requires the plaintiff to establish that the negligent conduct was a substantial factor in bringing about the harm." Id. (citations, quotations and brackets omitted). The negligent conduct does not need to be the only cause of the injury, but to establish proximate cause the plaintiff must prove that the defendant's conduct caused or contributed to cause the harm. Id.

Continental and Bellemore both moved for summary judgment, each arguing, in relevant part, that it did not cause or contribute to cause the accident. Both defendants argued that no genuine issue of material fact

6

existed regarding the cause of the flooding that led to the accident because the evidence demonstrated that it was caused by leaves and debris covering the grates of the catch basins.

The plaintiffs objected to the motions, relying, in large part, on the opinion of Broderick, their consulting engineer. According to Broderick's report, the recent construction work within the catch basin created or caused a blockage due to a dislodged polyethelene liner and this blockage was the cause of the flooding and automobile crash.

In response, Bellemore and Continental each filed a motion to strike Broderick's expert report, which the trial court granted. The plaintiffs filed a supplemental objection, and submitted with it, among other things, the expert report written by Murphy, a hydrologic/hydraulic engineer. The trial court declined to consider Murphy's opinion on causation and granted the defendants' motions for summary judgment after concluding that there was insufficient evidence "for a reasonable jury to find a cause of flooding attributable to each defendant that is not based on speculation."

Because the trial court's decision to exclude the expert reports was critical to its summary judgment order, we consider first whether the trial court erred in striking the reports, before turning to the question of whether the trial court erred when it granted the defendants' motions for summary judgment.

1. The Trial Court Erroneously Struck the Expert Reports

New Hampshire Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion" if, among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." N.H. R. Ev. 702. To be admissible, however, expert testimony must rise to a threshold level of reliability. Stachulski v. Apple New England, LLC, 171 N.H. 158, 164 (2018). "To determine the reliability of expert testimony, the trial court must apply RSA 516:29-a, portions of which codify principles outlined by the United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-95 (1993)," and which were applied by this court in Baker Valley Lumber v. Ingersoll-Rand, 148 N.H. 609, 614 (2002). Moscicki v. Leno, 173 N.H. 121, 124 (2020). RSA 516:29-a provides:

> I. A witness shall not be allowed to offer expert testimony unless the court finds:
> (a) Such testimony is based upon sufficient facts or data;
> (b) Such testimony is the product of reliable principles and methods; and
> (c) The witness has applied the principles and methods reliably to the

facts of the case.

II. (a) In evaluating the basis for proffered expert testimony, the court shall consider, if appropriate to the circumstances, whether the expert's opinions were supported by theories or techniques that:
(1) Have been or can be tested;
(2) Have been subjected to peer review and publication;
(3) Have a known or potential rate of error; and
(4) Are generally accepted in the appropriate scientific literature.
(b) In making its findings, the court may consider other factors specific to the proffered testimony.

RSA 516:29-a (2021). When applying these factors, "[t]he trial court functions only as a gatekeeper, ensuring a methodology's reliability before permitting the fact-finder to determine the weight and credibility to be afforded an expert's testimony." Stachulski, 171 N.H. at 164 (quotation omitted). While the proponent of the expert witness bears the burden of proving the admissibility of the expert's testimony, this burden is not especially onerous. Moscicki, 173 N.H. at 125. The overall purpose of Rule 702 and RSA 516:29-a is to ensure that a fact-finder is presented with reliable and relevant evidence, not flawless evidence. Id. "[A]s long as an expert's scientific testimony rests upon good grounds, . . . it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." State v. Langill, 157 N.H. 77, 88 (2008) (quotation omitted).

We generally review a trial court's determination of expert reliability under our unsustainable exercise of discretion standard. Baxter v. Temple, 157 N.H. 280, 286 (2008). When applying this standard, "[o]ur task is not to determine whether we would have found differently," but only "to determine whether a reasonable person could have reached the same decision as the trial court on the basis of the evidence before it." Benoit v. Cerasaro, 169 N.H. 10, 19, 21 (2016).

a. Broderick's Expert Report

According to his report, Broderick reviewed the discovery generated in the litigation and the documents that had been produced by DOT, viewed the site of the accident in 2018, and consulted with Murphy regarding whether the drainage system as designed was capable of handling the rainfall that occurred on October 21, 2016, the date of the accident. Based upon this review, he considered a number of possibilities regarding what had caused the flooding on the date of the accident. Broderick then concluded, in relevant part, that: (1) there was no documented history of crashes prior, or subsequent, to October 21, 2016; (2) there was no documented history of ponding or flooding prior, or subsequent, to October 21, 2016; (3) the documentation reflected that given

8

the use of the sweeper trucks during and following the work performed pursuant to the contract with DOT, the roadway should have been relatively free of debris and "the basins should have been clean"; (4) the drainage system as designed was capable of handling the rainfall that occurred on October 21, 2016; (5) it was unlikely that leaves caused the blockage of the catch basin; and (6) it was unlikely that construction debris played a role in the blockage of the catch basin because, had there been debris large enough to block the catch basin and cause drainage issues, this would have been noted in the call logs.

Broderick stated in his report that, "[a]lthough the [d]epositions of the DOT employees indicate that the water was freed up due to removal of roadway debris on top of the grate, it is doubtful that this was the case." Accordingly, he concluded that the flooding must have been due to a "surprise condition" unrelated to normal debris. Broderick's report states:

> My professional opinion is that the blockage that caused the flooding, and associated crash, on the night of October 21, 2016 was caused by a blockage within the outflow pipe for the catch basin, and was further exacerbated by some debris on the grates of the basins at the low point, where the flooding occurred. The only item large enough to block/partially block the pipe (a 15" pipe) would have to be within the structure. The only thing within the structure of sufficient size would be the cone of the Polyethylene Liner, which would have come dislodged due to a manufacturing defect, or a disturbance to the cone from an external force, such as moving around the hose or jetting high pressure water force, as done in cleaning operations for the catch basins, or a combination of both. The liner has more buoyancy than water so it would float up to the level of the pipe and would partially block the pipe causing a water backup onto the roadway, until the force of sufficient water pressure would force it to collapse and push it through the pipe. This most likely occurred at the same time as the DOT was working the debris at the grates of the basins.

The trial court identified two reasons Broderick's opinion was unreliable: (1) it is based on speculation without any factual support; and (2) he did not employ any scientific methodology in the case and, in particular, did not perform any testing.

The plaintiffs argue on appeal that the trial court unsustainably exercised its discretion and exceeded its gatekeeping function when it concluded that the expert opinion was not reliable because Broderick's expertise was necessary to assist the average layperson in understanding how the cause of the flooding could have been the clogging of the outflow pipe within the catch basin by part of the liner, rather than the debris on top of the grate. They assert that Broderick's opinion is reliable because, like the expert in Stachulski, who considered the underlying facts in the case and used his

9

expertise to evaluate the different potential causes of injury, Broderick considered the underlying facts in the case and used his expertise to evaluate the different potential causes of flooding, until he reached one that he could not rule out, and which he considered most likely to be the cause. We agree.

The plaintiff in Stachulski brought an action against a restaurant owner for strict products liability, alleging that he contracted salmonella by eating a hamburger at the defendant's restaurant. Stachulski, 171 N.H. at 162. The defendant disputed the allegation that the hamburger was the source of the salmonella illness, and asserted that the plaintiff's pet lizard or other food sources could just as likely have been the cause of the illness. Id. The jury returned a verdict for the plaintiff, and the defendant appealed. Id. On appeal, the defendant argued that the trial court unsustainably exercised its discretion when it allowed the plaintiff's expert to testify, contending the testimony was not "based upon sufficient facts or the product of reliable principles and methods." Id. at 163 (quotations omitted). We upheld the finding that the expert's testimony was based upon sufficient facts, noting that the expert relied upon sufficient facts including that: (1) the plaintiff was diagnosed with a type of salmonella that is typically food-borne; (2) neither his wife nor his daughter became ill even though both had contact with the plaintiff's pet lizard; and (3) his wife did not get sick even though he prepared meals for her and she has celiac disease, making her more prone to contract salmonella. Id. at 164-65. Regarding whether the testimony was the "product of reliable principles and methods," we noted that, using his expertise, the expert had "discussed and considered the . . . facts, eliminated potential causes, and concluded that the hamburger from the defendant's restaurant was, more likely than not, the cause of the plaintiff's salmonella illness." Id. at 165. We concluded that the defendant failed to demonstrate that the expert's methodology was deficient or that the testimony did not rest upon good grounds. Id. at 165-66.

The reasoning that led us to conclude that the expert testimony in Stachulski was "based upon sufficient facts" or the "product of reliable principles and methods" applies in this case. Stachulski, 171 N.H. at 165 (quotation omitted). Like the expert in Stachulski, Broderick used his expertise, "discussed and considered the . . . facts, eliminated potential causes, and concluded" that a detached polyethelene liner was, more likely than not, the cause of the blockage that led to the flooding on the day of the accident. Id.

Bellemore argues that Stachulski is distinguishable. Bellemore points out that the expert in Stachulski knew that the plaintiff had eaten a hamburger at the defendant's restaurant and that the plaintiff had been diagnosed with salmonella; that the expert excluded other possible causes of the plaintiff's salmonella; and that the timing of the symptoms was consistent with the hamburger being the cause of the salmonella. By contrast, Bellemore argues, Broderick did not know if a polyethelene liner was installed in the catch basin near the scene, did not know if the liner was damaged before the accident, and

10

relied on the "incredible claim that the catch basin's polyethelene liner collapsed at the exact moment that [DOT] workers were clearing debris from the grate covering the catch basin." Bellemore is correct that Broderick's opinion relies on these facts, but in order for Broderick's opinion to be inadmissible, it would have to be the case that no reasonable fact-finder could conclude that the facts that Broderick relies upon are true. See Brown v. Wal-Mart Stores, Inc., 402 F. Supp. 2d 303, 308-09 (D. Me. 2005) (the factual basis of an expert opinion goes to the credibility of the testimony, not its admissibility, and it is only when an expert opinion is so fundamentally unsupported that it offers no assistance to the jury that it must be excluded). Based upon our review of the record, there is sufficient evidence for a reasonable fact-finder to conclude that a liner was installed in the catch basin near the scene, that it was damaged before the accident, and that the liner collapsed as the DOT workers were clearing debris from the grate covering the catch basin. Accordingly, we conclude that, to the extent that Broderick's opinion relies on disputed facts, it "should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." Langill, 157 N.H. at 88 (quotation omitted).

The defendants argue that the trial court properly found that Broderick's opinion lacked factual support. Bellemore argues that Broderick "ignored" the State Police Report regarding the accident, DOT's log from the date of the accident, and the testimony of a state trooper and a DOT employee who arrived at the scene following the accident. The expert report, however, lists, as among the materials Broderick reviewed, the traffic crash reports, the DOT call logs, and the "[d]epositions [r]elated to [t]his [c]ase." In addition, Broderick's report specifically addresses the deposition testimony, and states:

> Although the Depositions of the DOT employees indicate that the water was freed up due to removal of roadway debris on top of the grate, it is doubtful that this was the case. Upstream basins on either side of this flooding would have collected any referenced debris as it passed over their grates become lodged in them instead of floating by and go further downstream. Had this not been the case, flooding would have repeatedly occurred at this location during any rain event, many of which have had much greater intensities than the event on the night of October 21, 2016.

Bellemore also argues that Broderick's report considered "skewed versions of the relevant facts" to exclude the possibility that debris that had collected on top of the catch basin grate caused the flooding. While the defendants are correct that there is substantial evidence that the flooding was caused by debris that had collected on the catch basin grate, there is also evidence in the record supporting the conclusion that it was unlikely that

debris from the highway caused the flooding. The area was swept for construction debris a month before the accident occurred, and while no DOT employee testified that they patrolled the area on the day of the accident, a DOT employee testified at his deposition that DOT employees routinely patrolled the highway on the day of storms to look for, and clear, debris. Broderick visited the accident scene in 2018 and concluded that leaves would not have caused the blockage. Furthermore, a number of witnesses testified at their depositions that they had no knowledge of prior flooding in the area of the accident, and there are no DOT reports of prior flooding in the area. As the plaintiffs point out, if surface debris could readily cause flooding, then, arguably, flooding in the area would have been a regular or common occurrence. The defendants also assert, accurately, that there is no direct evidence in the record that a liner was actually installed in the catch basin at the time of the accident, or that the liner was defective or damaged. However, evidence in the record could support a finding that liners were inserted in all of the catch basins during the rehabilitation project, as well as evidence that liners produced by Continental do sometimes get damaged, causing the downspout of the liner to separate from the top of the liner.

Finally, the defendants argue that Broderick's opinion should be excluded because Broderick neither tested his theory nor performed any analysis of how the blockage might have occurred. Therefore, he used no "specialized knowledge" that would assist the trier of fact in the search for the truth, and his theory of how the catch basin became blocked with a polyethelene liner is "entirely unsupported." The defendants point out that Broderick did not rely on any research literature or scientific studies to support his hypothesis regarding the cause of the accident, that although Broderick has general experience with workplace safety on construction sites, he never worked with polyethelene liners before being retained as an expert, and that he performed no testing to support his hypothesis that the liner separated and clogged the catch basin. We disagree that the lack of testing means that Broderick reached his opinion without using any specialized knowledge. Broderick is a civil engineer who worked for the Massachusetts Department of Transportation for forty-one years, and he worked in various fields of engineering relating to construction materials, maintenance, design, and traffic safety. In reaching his conclusions, he relied upon knowledge, education, and experience that will "help the trier of fact to understand the evidence or to determine a fact in issue." N.H. R. Ev. 702.

We conclude that any asserted defects in Broderick's opinion are matters affecting the weight of the evidence, but do not preclude its admissibility. Cf. Beckles v. Madden, 160 N.H. 118, 128 (2010) (where experts acknowledged that timely preventative care would have depended upon the action of particular individuals, whether or not the underlying events were more likely than not to have occurred given the particular individuals involved and the circumstances of the case were issues of fact for the jury to resolve). The

appropriate method for testing the basis of the opinion is by cross-examining Broderick, which will allow the jury to determine the weight to be accorded his testimony.  See Langill, 157 N.H. at 88.

b.  Murphy's Expert Report

Murphy was retained by Broderick to evaluate the "highway drainage conditions," and his report was attached to, and referenced in, Broderick's report.  Murphy's report reflects, as the trial court noted, that he reviewed the following documentation before preparing his report: (1) drainage computations for the Everett Turnpike from 1994; (2) plans of the proposed Everett Turnpike project from 1996; (3) Federal Highway Administration Hydraulic Engineering Circulars; (4) DOT standard construction drawings of Type A grate and frame, Type B grate and frame, and a polyethelene liner; and (5) National Oceanic and Atmospheric Administration climatological data from October 2016.  He also received the following information from Broderick: (1) there were no DOT records of flooding near the accident location prior to the date of the accident; (2) the State Police had no record of "highway runoff related accident" responses near the accident location prior to the date of the accident; and (3) during the routine resurfacing project, polyethelene liners were installed in all drainage catch basins.

Murphy's report identifies three possible causes of the flooding at the accident site: (1) localized blockage due to the settlement or displacement of a polyethelene catch basin liner; (2) age-related structural failure of local drainage network conveyance piping "due to material deterioration and or sediment abrasion"; and (3) debris-related surface blockage of a catch basin grate.  The report stated the following conclusions:

- The overall design capacity of highway drainage system in the vicinity of the accident site was sufficient to accommodate the maximum hourly precipitation rate of the storm that occurred on the night of October 21, 2016[.]

- With the cleaning of the structures and the roadway within a relatively short time frame before the accident of October 21, 2016, it is doubtful that there would be sufficient accumulation of roadway debris to block the inlet grate of any catch basin along Route 3 SB near the accident site[.]

- The inlet grate spacing (1.2 inches) of a NHDOT Catch Basin Grate Type "A"  . . . would preclude entry into a given local catch basin of debris sufficient in size to block that structure's outlet piping.
- The most likely mechanism for the travel lane flooding that

13

precipitated the October 21, 2016 accident appears to be settlement/displacement of the Polyethelene Liners that had been recently installed in one or more catch basins in close proximity to the accident site.

In its order on the defendants' motions for summary judgment, the trial court stated that although the defendants had not moved to strike Murphy's report, the argument was implicit in their replies to the supplemental objection to the defendants' motions for summary judgment. In declining to consider Murphy's opinion in evaluating the defendants' motions for summary judgment, the trial court order essentially concluded that Murphy's report suffered from the same shortcomings found with Broderick's report, and also had two additional shortcomings: that the report relied upon information provided by Broderick, rather than upon Murphy's independent examination of the discovery in the case, and that the report did not explain why the two other potential causes of the flooding were rejected. We conclude that the trial court exceeded its gatekeeping function when it declined to consider Murphy's opinion on causation when considering the motions for summary judgment for the same reasons we have concluded that the trial court exceeded its gatekeeping function when it granted the defendants' motions to strike Broderick's report. The fact that Murphy relied upon information conveyed to him by Broderick and the defendants' argument that the report did not explain why the two other potential causes of the flooding were rejected do not alter our conclusion. Again, these are matters affecting the weight of the evidence, but do not preclude its admissibility. Cf. Beckles, 160 N.H. at 128. Accordingly, the appropriate method for testing the basis of the opinion is by cross-examining Murphy, which will allow the jury to determine the weight to be accorded his testimony. See Langill, 157 N.H. at 88.

2. Motions for Summary Judgment

We review a trial court's grant of summary judgment de novo. Zannini, 172 N.H. at 733. When reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. SegTEL v. City of Nashua, 170 N.H. 118, 120 (2017). If our review of the evidence does not reveal any genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision. Id. An issue of fact is "material" for purposes of summary judgment if it affects the outcome of the litigation under the applicable substantive law. New London Hosp. Ass'n v. Town of Newport, 174 N.H. 68, 71 (2021). We have stated that

> [w]hile summary judgment can at times be a useful avenue to pursue in order to eliminate baseless claims from costly litigation, trial courts must be wary of its application. Its most effective use is in breach of written contract or debt cases. It becomes less

effective in tort cases where there are generally more disputed issues of fact. . . . [A]lthough the [summary judgment] statute is designed to reduce unnecessary trials, it is not intended that deserving litigants be cut off from their day in court.

Iannelli v. Burger King Corp., 145 N.H, 190, 192 (2000) (quotation and citations omitted).

Bellemore and Continental argued in their motions for summary judgment that there is no evidence that any action or inaction by either defendant breached any duty owed to the plaintiffs or caused or contributed to cause the accident. Both argued that the testimony of three eyewitnesses shows that flooding was the result of the accumulation of debris on the grate of the catch basin. The plaintiffs objected, asserting that the question of whether the catch basin was clogged at the surface was "strongly controverted." In its objections, the plaintiffs relied heavily on Broderick's expert report, and then Murphy's expert report, to establish causation.

We agree with the trial court that the issue is not whether there was "adequate evidence from which a reasonable jury could conclude that debris on the top of the catch basins was the culprit," but "whether construing all the evidence in the [p]laintiffs' favor, there is sufficient evidence for a reasonable jury to find a cause of flooding attributable to each [d]efendant that is not based on speculation." The trial court concluded, however, that the plaintiffs lacked any direct or historical evidence from which a reasonable inference could be drawn that a dislodged liner part caused the flooding. In addition, although the plaintiffs had not argued that liability could be imposed on the defendants based on a theory of res ipsa loquitur, the trial court addressed this question and concluded that the plaintiffs would not be entitled to a res ipsa loquitur instruction. The plaintiffs argue on appeal that this was error.

We conclude that the trial court erred when it concluded that there was insufficient evidence for a reasonable jury to find a cause of flooding attributable to each defendant that is not based on speculation. As the plaintiffs point out, Continental had very recently completed repaving and reconstruction of the catch basins within the area of the accident, and there is evidence in the record that these activities generated debris which could fall into the catch basins and would need to be vacuumed out or removed by someone climbing down into the catch basin. There is evidence in the record that the top of Continental's liners can separate from the cone portion under certain circumstances, or possibly due to a defect. There is also evidence that Bellemore would open the catch basin grates to remove any debris from the construction activity and that sometimes, in the process of raising catch basins, polyethelene liners can be damaged and become separated. And, as the trial court stated, "it is common sense that, if a part of a liner detached and fell into the sump and was free floating, it could block the outflow pipe and

15

interfere with the flow of water." It is also undisputed that neither Continental nor Bellemore conducted testing after completion of the project to assess the functionality of the catch basins. In light of this evidence, viewed in the light most favorable to the plaintiffs, and in light of the expert opinions provided by Broderick and Murphy, we conclude that there is sufficient evidence for a reasonable jury to find a cause of flooding attributable to the defendants. Beckles, 167 N.H. at 128. Accordingly, we need not consider whether the doctrine of res ipsa loquitur applies. See 57B Am. Jur. 2d Negligence § 1164 (2004) (explaining that the doctrine of res ipsa loquitur allows a jury to infer, "in the light of common sense and past experience, that the accident was probably the result of the defendant's negligence, in the absence of an explanation or other evidence which the jury believes").

We conclude, after considering the affidavits and other evidence, and all inferences properly drawn from them in the light most favorable to the non-moving party, that there are genuine issues of material fact that preclude the granting of summary judgment in this case. See SegTEL, 170 N.H. at 120. Accordingly, we reverse the trial court's order granting the defendants' motions for summary judgment.

> Affirmed in part; reversed in part; and remanded.

BASSETT and DONOVAN, JJ., concurred.

16